## No. 2649.

### BUNK ALLEN *v.* THE STATE.

1. MURDER—EVIDENCE—SELF DEFENSE.—It is a well settled principle of law that if one willingly enters into a deadly conflict, or provokes the contest, or produces the occasion, in order to have a pretext for killing his adversary or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the conflict. Note the opinion for a state of proof in a murder case to which the rule applies, eliminating the issue of self defense.

2. SAME—INTENT—CHARGE OF THE COURT.—Intent is a condition of the mind which may be evidenced by outward acts or words spoken. The evidence in this case shows that after the apparent abandonment of the dispute, and after the deceased had put away his pistol, and started to leave, but before he actually left the ground, the accused, displaying his pistol, said: "We had as well settle this thing now," and almost immediately fired upon deceased. The defense claims that, in charging upon the legal consequences of the renewal of the difficulty by the accused, the court erred in failing to instruct the jury that they might inquire into the intent of the accused in renewing it. *Held*, that the proof in question manifested the intent, and was undisputed; wherefore there was no issue requiring such an instruction.

3. SAME.—Note the opinion for a state of proof under which, in charging the jury upon the right of the accused to act upon the appearance of danger, the trial court did not err in instructing only upon the appearance of *real* danger.

APPEAL from the District Court of Wise. Tried below before the Hon. George A. McCall.

The conviction in this case was in the second degree for the murder of Tom Gill, in Wise county, Texas, on the fifth day of April, 1886. The penalty assessed against the appellant was a term of thirty years in the penitentiary.

J. W. Hutchinson was the first witness for the State. He testified, in substance, that he had an appointment to go with the deceased to the country, after a cow, on the fifth day of April, 1886, and, for the purpose stated, met the deceased at about nine o'clock that morning, on the public square in Decatur, Wise county. To the witness's proposition to go at once after the cow the deceased replied that he was not then ready; that he had been informed that Bunk Allen, the defendant, had been threat-

ening around town to "put out his light" before night, and that he wanted to see about it. Twenty minutes later the witness again met the deceased on the southeast corner of the square, and again proposed to go after the cow, but deceased insisted that he would wait a while longer to see the defendant about the threats. The witness, leading his horse, and the deceased were then standing a few feet north from the walk in front of Dwyer's store, which occupied the east corner of the south side of the square. The Bank saloon was across the street, immediately east of Dwyer's store. The street intervening between the saloon and Dwyer's store ran north and south across the square, and was about fifty feet wide. While witness and deceased were standing at the point indicated, the defendant and Dick Derrett came along, traveling the sidewalk, and going east toward the saloon. When they got about opposite witness and deceased, the latter, drawing his pistol and raising it until the muzzle pointed backward over his shoulder, stepped to defendant and said to him: "Bunk, I understand that you have said that you will put my light out before sun down." The defendant denied that he made the threats and the deceased asked him: "D—n you, didn't you say it?" Defendant replied: "No; I have been wanting to see you and have a talk with you." After a few more words passed, the deceased said: "That settles it," and lowered his pistol, and started west towards Dwyer's store. Witness did not observe what deceased did with his pistol, but, thinking the difficulty was over, he turned to his horse. About that time witness heard defendant say: "Tom, we will settle this thing now," or "Tom, hadn't we better settle this thing now?" Looking back at once, the witness saw the defendant with his pistol held in both hands and pointed west towards Dwyer's store. The shooting commenced at once, five or six shots being fired. Witness did not know which party fired first. After the shooting, witness saw the dead body of the deceased lying in Dwyer's store. One ball entered the right breast and passed out at the top of the left shoulder. Deceased did not curse the defendant otherwise than as stated by the witness, nor did he call the defendant a "son of a bitch."

George King, the next witness for the State, testified that he and Clabe Cates were on the street between the Bank saloon and Dwyer's store at the time of the shooting. Witness saw the deceased and Hutchinson near Dwyer's store, and a few moments later he observed the approach of the defendant and

Derrett. He then saw the deceased draw his pistol and throw it over his shoulder until the barrel pointed behind him and step up to defendant. He said to defendant: "I have heard that you are going to put my light out before sun down." Defendant denied having made the threat, and, upon deceased asking him if he made the threat, he replied: "No; I have been wanting to see you for some time. I have nothing against you, and never did have." Deceased then said: "That is all right; that settles it," lowered his pistol and walked off towards Dwyer's corner. Witness then turned to defendant and said to him: "You are in enough trouble; if I were you, I would let this thing alone." Defendant made no reply to witness, but· walked north a few steps, drew his pistol, called to deceased and said: "We will settle this thing now," firing towards deceased at that instant. Deceased was in the act of stepping upon the porch in front of Dwyer's store. He passed into Dwyer's store, and witness saw him no more until after the fight was over. He was then dead. Defendant fired the first two shots in very rapid succession, and the deceased's first shot followed an instant later. The shots were all fired in very rapid succession. Defendant held his pistol in both hands and fired four shots. The deceased fired two shots. Deceased did not curse the defendant nor call him a son of a bitch.

Clabe Cates testified, for the State, substantially as did the witness King up to the point where the deceased lowered his pistol with the remark "that settles it," and started off with witness. From that point the witness testified substantially as follows: When the deceased started off with witness he lowered his pistol and put it down in his pants on the left side and pulled his vest down over it. He and witness then walked towards Dwyer's store, witness being on the right side of deceased. Just as they stepped to the porch in front of Dwyer's store, witness heard deceased's name called, with a remark he did not understand. Immediately after the call a pistol fired, and deceased sprang into the door of Dwyer's store, drawing his pistol as he went in. Witness sprang from the sidewalk to the right. Deceased soon appeared at· the door of Dwyer's store with his cocked pistol in his hand and he and defendant fired at each other. Deceased stepped back and cocked his pistol, which appeared to be out of repair. He then returned to the door and fired again, his pistol appearing to go off before he was ready. He then stepped back into the store and began to manipulate

his pistol, which would not revolve, and at this juncture the defendant fired and shot him through a glass door. Deceased did not curse the defendant nor call him a son of a bitch.

Mont Cates, who heard nothing and only saw the shooting from a distance, testified substantially as did Clabe Cates as to the movements of the parties at the time of the shooting, and said that defendant and deceased fired at very nearly the same time.

R. B. Stanton testified, for the State, that he was in Dwyer's store when the fatal difficulty occurred. He was behind the counter and about half way down the store room, when he heard the report of a pistol, fired, he thought, about the Bank saloon. Witness then made a quick step to the front of the store, and saw deceased jump to the porch going west. He entered the east door with his pistol in both hands and appeared to have just drawn it from his pants, his vest being turned up. He then stepped to the door and fired; some person firing from the east about the same time. He then stepped back, cocked his pistol, returned to the door and fired again, his pistol evidently going off before he was ready. He then stepped back and was manipulating his pistol, when two shots were fired through the glass door. The last shot struck and killed him.

M. Dwyer testified, for the State, that, looking east from the back door of his store, he saw defendant, deceased and George King standing near the back end of the Bank saloon. Deceased had his pistol in his hand, resting on his hip, but soon raised it above his shoulder, so to point behind him. He and defendant appeared to be talking, but witness could hear nothing they said. Presently deceased put his pistol down in his pants, covered it with his vest, and turned and walked toward the front door of witness's store. Defendant walked north to the front door of the saloon, when he drew his pistol, presented it with both hands and fired. Witness could not then see deceased. Defendant continued to look west as if watching for some one. He presently raised his pistol and fired again, and about the same time a pistol was fired at witness's front door. Several more shots were fired. When it was all over, witness went to the front of his store, where he found the dead body of deceased.

W. L. York testified, for the State, that, from where he was on the west side of the square, he heard the shooting at the south east corner of the square. He started to that point and met the defendant, who, waving his pistol several times, exclaimed:

"By God, I reckon I am the chief!" W. A. Bonner testified, for the State, substantially as did York, and in addition that the defendant called for another "gun," and for "protection."

The State closed.

J. F. Ford was the defendant's first witness. He testified that he was on the square and near the front of the Bank saloon when the fatal difficulty occurred. He heard the defendant call to the deceased and say something about "settle." He then saw defendant, using both hands, fire his pistol towards Dwyer's store. At the time defendant fired, witness saw deceased with his pistol in his hands, the pistol pointing downwards. Witness could not say whether deceased was then looking towards or from defendant. Defendant fired the first two shots, but his second shot and the deceased's first shot were fired at very nearly the same time.

Tip Rush testified, for the defense, that about twenty minutes before the fatal meeting of the defendant and deceased, the deceased came from the Bank saloon to the witness, who was then standing in front of Dwyer's store, took hold of witness and said to him: "Come, go with a gentleman, and don't run with that d—n fellow." Witness went with deceased to the mayor's office and executed a bail bond, witness being charged with carrying a pistol and deceased signing his bond. Witness and deceased separated, and within a few minutes defendant came to witness and said: "That boy ought not to have said that. He has my sympathy, but if he don't want it, it is all right. If he comes at me for a fight, I will fight him, and fight him d—d hard." Defendant was close enough to hear the language used by deceased just before they went to the mayor's office. Deceased was drinking at the time.

Mike Chambliss testified, for the defense, that, during the year 1884, when witness was running a saloon in Decatur, and defendant was keeping bar for him, defendant asked witness to go to deceased and compromise their quarrel. Witness went to deceased and proposed to compromise on behalf of the defendant. Deceased replied that he had no compromise to make, and that if the law did not handle the son of a bitch, he would kill him. Witness reported deceased's statement to defendant, and then discharged defendant because, by keeping him, he was losing the patronage of deceased and his friends. Defendant then went to work for Lewis & Willis at the Bank saloon. The witness testified for the defendant upon the latter's trial for the

murder of Mack Gill. Defendant testified in behalf of the witness on the trial of the witness for the murder of Fambrough.

M. W. Miner testified, for the defense, that he was deputy sheriff of Wise county in the year 1883. In December, 1882, Mack Gill and the deceased's brothers, got into a fight with the defendant, in the course of which Mack Gill was killed, and the deceased was wounded. One W. S. Gilbert and the defendant were indicted for the murder of Mack Gill. One night, during the year 1883, the witness and W. S. Gilbert went into the Bank saloon to get a drink. As they approached the counter the witness saw deceased among the several parties present, and noticed that Gilbert backed off on seeing deceased. Witness thereupon took deceased to one side and asked him what was the matter between him and the defendant and Gilbert. He replied that the defendant had said that "he got his man," and that Gilbert, in that same connection, said that he "wished he had got the one he shot at." Witness told deceased that he did not believe that defendant and Gilbert made the remarks imputed to them, and that, if deceased would confront defendant and Gilbert, he, witness, would bet his ears that they would deny making the remarks. Deceased replied that if Gilbert did not make the remark, he would make friends with him; that he could "hug" Gilbert, but as for Bunk Allen, he wanted no "truck" with him. Defendant was tried at the last term of the court for the murder of Mack Gill and was acquitted. The prosecution against Gilbert for the same offense was dismissed.

Tom Whitehead testified, for the defense, that he had often known the defendant, in order to avoid meeting deceased, to leave places upon the appearance of deceased; and often, when he knew deceased to be in town, at night, he would sleep with witness. Mr. Willis, one of the proprietors of the Bank saloon, in which defendant was employed as bar tender, testified that he had often seen the defendant leave the saloon when deceased entered.

Mr. Lewis, Mr. Willis's partner, corroborated the statement of the latter, and testified, in addition, that he finally discharged defendant to avoid losing the patronage of the deceased and his friends. The witness also stated that, some time in 1885, in Harvey's office, and in the presence of Harvey, he proposed to buy a certain pistol from deceased. Deceased refused to sell the pistol, saying that he would not part with it, as he wanted to kill Bunk Allen with it. Witness had never heard defendant

threaten to kill deceased. Witness never, at any time, gave a note to R. J. Bonner, to be delivered to deceased, upon which was written "Look out for danger." After he quit working for witness, the defendant went to Abilene, and his residence was in that town when he killed deceased.

James Spann testified for the defense, that, about eighteen months before the killing of deceased, he heard some one in Sparrow's drug store say to deceased: "Bunk Allen is in town." Deceased replied: "Yes, God d—n him; I don't know what he is here for. He and I can't live in the same town, and if he don't leave he or I will have to die." Witness never told any one of that statement except his father-in-law, whom he told on the day of, and just after the killing of deceased. Sparrow was behind his prescription case at work when deceased made the statement detailed.

Ben Allen, the defendant's brother, testified in his behalf that at the time of the homicide the defendant was living in Abilene, but was in Decatur attending his trial for unlawfully selling liquors. He was tried on Saturday, and was to have returned home on the night train on the day of the killing.

John Strickland testified, for the defense, that he met the defendant at Fort Worth en route to Decatur to stand trial for unlawfully selling liquors, and witness accompanied him to Decatur. The defendant took no pistol with him from Fort Worth to Decatur, but borrowed one about nine o'clock on the morning of the killing.

S. S. Cobb testified, for the defense, that he took a nearly full bottle of whisky from the dead body of the deceased. Frank Lovejoy testified, that a short time before the killing he saw deceased take a drink of whisky from a bottle which was then nearly empty.

J. W. Oates testified, for the defense, that just before the fatal shooting he heard the defendant say to deceased: "If we have to settle this thing, we may as well settle it now." Defendant and deceased drew their pistols about the same time, and fired at each other about the same time.

R. E. Derrett testified, for the defense, that he was with the defendant when the fatal difficulty occurred. Deceased drew a pistol, ran up to the defendant, thrust the pistol in his face, and said: "You God d—d son of a bitch, did you say you were going to put my light out?" Defendant denied that he made such threat, and deceased said: "You are a d—d liar; you did say

it." Defendant replied: "No, I did not." Deceased then put his pistol down his pants in front, and turned off; but looked back and asked defendant: "Didn't you say it?" Defendant replied that he did not. Deceased then went to the front of Dwyer's store, when defendant called to him: "We had as well settle this thing now." Deceased turned, drawing his pistol. Defendant drew his pistol about the same time. They opened fire on each other about the same time, and the firing continued until deceased was killed.

M. B. Griffith testified, for the defense, that he saw the parties when they separated, deceased going towards Dwyer's store. Just as he reached the gravel walk in front of Dwyer's, deceased turned and said: "I will see you later, Bunk." Defendant replied: "If we have to settle this, we had as well settle it now." Deceased turned, drew his pistol and fired at defendant. Defendant then raised his pistol and fired at deceased, and the firing continued until deceased was killed. Witness plainly saw defendant raise his pistol and fire after deceased fired the first shot. He had not seen defendant's pistol until after deceased fired, and did not know when it was drawn.

The defense closed.

H. T. Harvey testified, for the State, that defendant was in his place of business on the Saturday before the killing. Scott Gordon was present. Defendant, who was drinking, said: "I wonder if that son of a b—h Tom Gill is in town. I want to settle with him before I leave." Defendant then had a pistol on his person. Witness never heard the deceased, in his place of business or elsewhere, in the presence of John Lewis or anybody else, say anything about defendant. Deceased's reputation was that of a quiet, peaceable, inoffensive man.

J. W. Sparrow testified, for the State, that from his work place behind his prescription case, in his drug store, he could hear nearly anything said in his drug store. He never, at any time, heard the deceased make the declaration testified to by the witness Spann. Deceased was a peaceable, quiet, law abiding man.

R. J. Bonner testified, for the State, that about a year before the homicide John Lewis gave him a note to hand to deceased, on which was written: "Look out for danger." Witness gave the note to deceased.

The State closed.

Matt Clarke testified, for the defense, that he looked from the Bank saloon just before the shooting, and saw deceased with his

pistol pressed against the defendant's stomach, and heard deceased call defendant a son of a b—h, and say that he would blow defendant's light out.

*Crane & Patterson, E. C. Smith* and *H. M. Furman,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. Under an indictment charging him with the murder of Tom Gill, appellant was convicted below of the second degree of that offense.

A number of witnesses for the State testified that appellant fired first in the interchange of shots which led to the homicide; others for the State timed the first firing as so nearly simultaneous that it was impossible to say which of the two took the initiative. Two witnesses for the defense testified that deceased fired first; others were in doubt. But the testimony of all left beyond dispute these facts: There had been a passage of words between appellant and deceased; angry and accompanied with a show of violence on the part of the deceased, and deprecatory—in semblance at least—on the part of appellant. In response to appellant's disclaimer of certain threatening and abusive language, attributed to him by deceased concerning himself, deceased had closed the controversy with the reply: "That settles it, then;" and, returning the pistol he had displayed to his pocket and walking off, his back was turned to appellant. Before he was out of hailing distance, deceased was stopped with the exclamation from appellant: "We had as well settle this thing now," or words of that import, accompanying the words with the display of a pistol held in both hands, which he almost immediately thereafter used with deadly effect. As to this renewal of the difficulty after it had been abandoned by deceased, both by word and act, there is no sort of conflict in the testimony.

It is well settled in principle that, where one willingly enters into a deadly conflict, or "provokes the contest, or produces the occasion, in order to have a pretext for killing his adversary or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat." (Cases on Self Defense, H. & T., 227, and note; Reed v. The State, 11 Texas Ct. App., 509; King v. The State, 13 Texas Ct. App., 277; White v. The State, 23 Texas Ct. App., 163; Peters

v. The State, 23 Texas Ct. App., 687; The State v. Partlow (Mo.), Southwestern Reporter, May 16, 1887.)

The application of this principle to the facts of this case completely eliminates the question of self defense, whence it follows that the errors complained of in the admission and rejection of testimony—if indeed they be errors—become immaterial and harmless.

It is made subject of complaint that, in instructing the jury as to the legal consequences of appellant's renewal of the difficulty—if they should find that appellant did renew it—the court erred in failing to direct the jury that they might inquire into the intent with which it was renewed. To this it is answered that every instruction given by a court to a jury in the trial of a cause should be confined to the issues made by the facts. We are of opinion that the undisputed facts of this case relieved the court of the duty of charging upon the intent. Intent is a condition of the mind, to be spelled out from outward acts or spoken words. In this case the act was the presenting of a pistol within range, held in both hands, presumably to secure greater accuracy of aim. The words accompanying the act conveyed a desire and intention to "settle" the matter then and there, with a deadly weapon as the arbitrator. Spelling out the intent in the light reflected from the word and act, its reading and interpretation can not fairly be treated as an open question.

It is further urged that the court erred in instructing the jury that "it would be immaterial whether the danger was real, provided the defendant acted upon the real appearance of danger." The specific objection raised is that "it limits and abridges the right of the defendant to act upon *real* appearances of danger, and omits *reasonable* appearances of danger." The same general answer applies to this objection as to the one preceeding. Danger with reference to whether the appearance of it is "real" or "reasonable," takes its classification under one or the other, according as whether the manifestations are positive, threatening and imminent, or are merely such as reasonably create alarm and apprehension for one's safety. "Real" danger is a danger such as is manifest to the physical senses; "reasonable" danger, as the very force of the term imports, is something to be judged of by an exercise of reason and judgment, exercised upon acts which require construction to render their meaning apparent. It is manifest from the facts in evidence that whatever danger there was to appellant, if any at all, was *real;* and hence the

court discharged its duty when it instructed the jury upon that character of danger, it not being bound to instruct upon another form of danger, which the facts not only did not present, but absolutely precluded.

The evidence in the record amply supports the verdict and judgment; and, the rulings and charges of the court being free from reversible error, the judgment is affirmed.

*Affirmed.*

Opinion delivered November 9, 1887.