## A. N. BYERS V. TERRITORY.

No. 2177, Okla. T    Opinion Filed March 15, 1909.

(100 Pac. 261.)

1.    **EVIDENCE—Matters of Common Knowledge—Harmless Error—Admission of Expert Testimony.** Expert testimony is not admissible upon questions which the court or jury can decide upon the facts. When the relation of facts and their practicable results can be determined without special skill or study, the facts themselves must be given in evidence, and the conclusions and inferences must be drawn by the jury; but, to render the admission of such expert testimony reversible error, it must tend to solve or to determine some issue in the case adversely to the accused, and if it be clear that its admission did not do so, or in some manner injuriously affected the accused, this court will not reverse the judgemnt of the court below because of its admission.

2.   APPEAL—Harmless Error. This court will not reverse the judgment of the trial court, where the record before it shows that the accused had a fair trial, by a fair and impartial jury and trial judge, simply because harmless error may have occurred at the trial.

3.   NEW TRIAL—Newly Discovered Evidence. It is not an abuse of discretion for a trial court to overrule a motion for new trial based on the grounds of newly discovered evidence, if such evidence is unimportant, immaterial, or cumulative, and the submission of such evidence to the jury would not have produced, or tended to produce, a different verdict from that rendered in the case.

4.   INSTRUCTIONS—Requested Instructions Covered by Others. It is not error for the court to refuse to instruct the jury at the request of the accused, if such requested instructions, though proper, are fairly covered by the general instructions given the jury by the trial court.

(Syllabus by the Court.)

*Error from District Court, Comanche County; F. E. Gillette, Judge.*

A. N. Byers was convicted of manslaughter, and he brought error to the Supreme Court, whence the cause is transferred to the Criminal Court of Appeals.   Affirmed.

At the August, 1906, term of the district court the grand jury of Kiowa county returned an indictment against the plaintiff in error (hereinafter referred to as the accused), charging that on the 27th day of December, 1904, he committed the crime of murder by taking the life of his wife, Salinda Byers.   At the same term of court a change of venue was granted on application of the accused, and the case was transferred to Comanche county, the accused was tried and found guilty of manslaughter in the first degree.   A motion for a new trial was filed and overruled, and on the 12th day of October, 1906, judgment was pronounced, sentencing the accused to the penitentiary for a term of 15 years.   On March 25, 1907, an amended motion for a new trial, on the grounds of newly discovered evidence, was filed, said motion being supported by several affidavits. The amended motion for a new trial was overruled on the 5th day of April, 1907.   An appeal was prosecuted from said judgment to the Supreme Court of this state, where the same was

pending at the creation of this court. Upon the creation of this court said case was duly transferred.

*A. J. Morris* and *Stilwell H. Russell*, for plaintiff inerror.— On inadmissibility of expert opinions in matters of common knowledge and question of harmless error: *People v. Smith* (Cal.) 29 Pac. 64;*Railway Co. v. Kellog*, 94 U. S. 469; *Fire Insurance Co. v. Gruver*, 100 Pa. St. 266; *Mining Co. v. Broderick*, 25 Colo. 16; *Cooper v. State*, 23 Tex.; *Stumore v. Shaw* (Md.) 6 Am. St. Rep. 412; *Railroad Co. v. Jones*, 114 Ala. 519; *Jones v. State*, 71 Ind. 84; *Wilson v. United States*, 5 Ind. Ter. *Smith v. Shoemaker*, 17 Wall. 630; *Railroad Co. v. O'Reilley*, 158 U. S. 334; *Railroad Co. v. Wilson*, 12 Colo. 20.

*Charles West*, Atty. Gen., and *Charles L. Moore*, Asst. Atty. Gen., for the State.— On question of harmless error: Wilson's Rev. & Ann. St. 1903, §§ 5144, 5618; *Wells v. Territory*, 14 Okla. 441; *Morris v. State*, and *Cannon v. State*, *ante*, this volume.

BAKER, JUDGE (after stating the facts as above). The accused relies upon the following assignments of error:

"(1) The court erred in admitting certain evidence on behalf of the defendant in error; (2) the court erred in excluding evidence offered by the plaintiff in error; (3) the court erred in its instruction to the jury; (4) the court erred in overruling a motion for a new trial on behalf of the plaintiff in error; (5) the court erred in rendering judgment against the plaintiff in error; (6) the court erred in overruling plaintiff in error's motion for a new trial on the grounds of newly discovered evidence; (7) the court erred in refusing certain instructions requested by the plaintiff in error; (8) error of the court occurring at the trial and excepted to by the defendant."

The first error claimed is directed to the admission of the testimony of Dr. Miller over the objection of the accused. The doctor was asked the following question:

"I will ask you if a woman of the build and stature of Mrs. Byers, dressed in the manner and condition in which you found her at the time of her death, could have taken the pistol, a double action, say, with a barrel four inches in length, and have inflicted, holding it in her right hand, the wound on her person

such as you found under the arm and on the left side of the body."

The doctor's answer was that it would have been impossible for the deceased to have inflicted the wound from which she died. A similar question was asked Dr. Voyles, and he was permitted, over the objections of the accused, to answer, and answered: "It is inconveniently possible, but not probable." It is urged by counsel for the accused that prejudicial error occurred in the admission of testimony of said doctors, on the ground that the evidence does not relate to any trade, science, or profession, but relates solely to a physical fact, of which the jury, as a matter of common knowledge, were as competent to judge as the witnesses. This court recognizes the rule that expert evidence is incompetent if the facts proposed to be proved are within the common experience of mankind. This court believes that it is much safer to confine the testimony of witnesses to the facts, in all cases where it is practicable, and leave the jury to exercise their judgment and experience upon the facts proved; that it is generally safer to take the judgments of unskilled jurors than the opinion of hired, and generally biased, experts. Still we are not ready to discard expert testimony, as in many cases it is both essential and important.

The question therefore arises: Was the testimony complained of, in the light of all the evidence in the case, prejudicial to the material rights of the accused, and was the testimony of such character as to prejudice the rights of the accused? In other words, did the admission of this testimony deprive the accused of a fair and impartial trial? The question can only be properly determined by a careful reading and investigation of all the evidence contained in the record. This we have done, and we find from the record that the evidence, though possibly improper as expert testimony, was not, in the light of all the testimony, harmful to the rights of the accused; the theory of the defense being that the accused was not guilty of the homicide, but that death resulted from wounds ,inflicted

by the deceased, or in some way, in the struggle that ensued to prevent great bodily harm or possibly death to the accused. There is no controversy whatever about the cause of the death. No witness contradicted the statements made by the accused in explanation of the occurrence which resulted in the death of his wife. There is dispute about the location of the wounds, or the point of entrance, course, and exit of the bullets that produced the wounds found upon the body of the deceased. The accused was given the greatest latitude 'by the trial court in describing the scenes and occurrences at the time of the homicide. Other witnesses were permitted without objection, to locate and describe the wounds upon the deceased, their entrance, course and exit through the head and body, and all the surrounding facts and circumstances in detail.

We find the case of *Wells v. Territory of Oklahoma,* 14 Okla. 436, 78 Pac. 124, on the question of harmless error in the introduction of expert testimony an instructive one, and seems to us to be the law. The second syllabus reads:

"Where a witness, who is qualified as a medical expert, as coroner had made a careful examination of the body of the deceased and the surroundings shortly after the homicide, and, after having described the wounds, points of entrance, and exit and direction of the bullet through the body, and all of the surrounding facts and circumstances in detail, was permitted to give his opinion as to the position of the deceased at the time that the wound was inflicted, and where the defendant admits the killing, and there is no issue on which the testimony could operate against him, held, if error, harmless, and would afford no grounds for reversal."

Another very carefully considered case is the case of *Coyle v. State,* 31 Tex. Cr. R. 604, 21 S. W. 765, the fourth syllabus reading as follows:

"On a trial for murder, where the physician testified that from his examination of the wound and clothing of deceased immediately after the homicide, etc., it was his opinion that at the time the shot was fired the right arm of deceased was hanging at his side, slightly to the rear of a perpendicular line, held that,

conceding the position of deceased's arm could not thus be proved still to render the admission of such testimony reversible error it must tend to solve some issue in the case adversely to the defendant; and, if it be clear that its admission did not do so, nor in some way injuriously affect him, this court would not be authorized to reverse the judgment because of its admission."

These cases we believe correctly state the law. We, therefore, approve them. See, also, cases cited in 12 Amer. & Eng. Enc. of Law (2d Ed.) p. 449.

We think that in the light of all the testimony in this case, the testimony of both Dr. Miller and Dr. Voyles was not in the least harmful or prejudicial to the accused, and the court did not therefore commit reversible error in permitting the introduction of the same.

The accused also complains of the court below in refusing to allow him to answer a question propounded to him by one of the jurors, in which the juror asked: "Would it not be pretty near impossible for her to get her left arm in under both of your arms after that?" We think the trial court properly interferred when he said: "That is a physical fact that is to be determined by the jury from the evidence, and not by the witness." The question of the juror does not seem predicated upon any proof offered, there being no testimony that the left arm of deceased was under both arms of the accused, and it seems to this court that the court below did an act of kindness toward the accused in not permitting this question to be answered; for in the light of the testimony we are unable to see how any answer could be given to this question that would be beneficial to the accused. He had every opportunity to explain how her left arm might have gotten under both of his arms if that was a material circumstances in the case beneficial to accused. He had full opportunity to explain all that occurred at the time of the homicide.

We fail to see error in the exceptions taken to the testimony of witness Delestineer. And are likewise unable to see how the accused was prejudiced by excluding from the jury the evidence of John Newby when he was asked, "Do you remember

starting to haul some things from the house there once, and Mrs. Byers got the sewing machine and threw it under the wagon, and threw other stuff out, and broke up things generally?" his answer being, Yes, sir." And the further question was asked Newby: "And Mr. Byers had to ask you to go away and leave things?" which he also answered, "Yes, sir." We cannot understand how this sewing machine incident could have had any direct bearing upon the homicide, or throw any light upon it, and therefore its exclusion was not prejudicial to the accused.

The remaining error growing out of the exclusion of testimony relates to certain transactions between the accused and one Grofner, a former husband of the deceased. This court is unable to understand how the accused could have been prejudiced in the exclusion of the testimony of the accused concerning his difficulty with Grofner. Many threats had been shown to have been made by the deceased against the accused, many of them being threats to kill the accused. The threats involved in the controversy between the accused and Grofner, having occurred in April, 1903, were therefore somewhat too remote to have shed any light upon the question as to who was the aggressor in the controversy that resulted in the death of the deceased in this case; nor did it shed any light upon the question as to whether the accused acted in self-defense or not, and did not reflect the state of the accused's mind at the time of the homicide. We do not think the court erred to the prejudice of the accused in excluding the evidence regarding the Grofner transaction from the jury. Naturally the testimony of the witnesses at the trial varied somewhat in minor details. So far as the record shows, no one save the participants were present at the time, or witnessed the homicide, and the immediate circumstances leading up to it.

The evidence clearly shows that about 6 o'clock on the evening of the 27th of December, 1904, certain shots were heard in the direction of the home of the accused and deceased, in the town of Gotebo. Some 20 minutes after the shots were fired

accused appeared in Dalton's store in said village, complaining of a scalp wound, a weak heart, and injuries to his hip, apparently suffering great pain, and was greatly excited. He gave various accounts of his trouble with the deceased, and, calling attention to the scalp wound on his head, exclaimed, "She shot, she shot, and just kept on shooting." At the trial the accused claimed the wounds were inflicted on the deceased by the accidental discharge of a pistol held in her right hand, which he had pushed around to her left side, but, owing to his intense excitement at the time, he could not explain just how it all happened. About an hour after the tragedy, when the officers returned to town after finding the body of the deceased, the accused was placed under arrest, and when told that he was arrested for shooting his wife, said: "Why, bless your soul, I didn't know she was shot." At the trial he claimed he acted in self-defense; that while sitting down, or about to sit down to a typewriter to write a letter to his sister, his wife, without warning, shot him with a pistol, the bullet grazing his head and inflicting a scalp wound, being the wound he complained of shortly after the tragedy; that in the haste and excitement in raising to his feet after he was shot he overturned the typewriter table with the machine upon it, then turning around, facing his wife, seized her by the right wrist, she at the time holding the weapon in the right hand, and that then a life and death struggle ensued to prevent her from killing him, and which ended by both falling on the bed, he in a dead faint; that when he recovered his consciousness he found his wife's body prostrate and bleeding, and then endeavored to mop up some of the blood with the bed clothing, and caught her by the ankle and called her by name, but she made no response.

According to the testimony of the witness Martin, on Saturday night prior to the tragedy the accused told Martin he thought he would have to kill his wife. He was the owner of the pistol with which the fatal shots were fired. There was no evidence of the pistol being in the possession of the deceased prior to the homicide. The pistol was a 38 caliber, and was about 6 1-2 or

7 inches long. One shot entered just below and behind the left ear of the deceased, the bullet ranging slightly upward from the point of entrance, emerging from the right cheek, the bullet being found about a year afterwards in a mass of coagulated blood in the bed clothing which was under her at the time she was found dead. From the testimony of Heck Thomas, who testified, without objection, as a pistol and gunshot wound expert, the jury could well find that at the time of the discharge of the pistol the muzzle must have been some little distance from the point where the bullet entered the neck, the pistol not being close enough, at the time of its discharge, to deposit flakes of burned powder around the bullet hole. It is undisputed that this wound was instantly fatal. The location of the wound was such as to have ruptured at least one of the large arteries of the neck. The bullet of the other shot entered into the body of the deceased immediately behind and below the left arm, and emerged at the left nipple. This bullet was found resting by its own weight near the right nipple in the under vest of the deceased. No trace of blood was found in any part of the room, except upon the bed and clothing of the deceased, and a curtain hanging near the bed. About 20 minutes elapsed after the shots were fired before the accused left the house where the homicide occurred. There is no dispute that the deceased's body was found lying clear across the foot of the bed upon her face and stomach, and her head near the wall at the back side of the bed, her feet protruding over the front; one of her leggings was smeared with blood, the left hand under the body, and the right partially extended. The pistol was found in her right hand, with the middle finger of her right hand on the outside of the pistol guard. There were three empty chambers in the pistol.

Search was made for the bullet holes in the walls of the room where the tragedy occurred at the time the coroner's inquest was held, which occurred soon after the finding of the body. Search was also made the next morning, but no bullet holes were found. The search was especially directed to the place over the type-

writer table. Some two weeks later, however, the witnesses for the defense found what they claimed to be a bullet hole in the wall about four feet from the floor, at a point near where the typewriter table stood at the time of the homicide. The evidence also shows that the typewriter table was tilted on its side, and the machine lying on the floor bottom side up, apparently uninjured. The dining table was overturned, but the dishes were unbroken, though strewn in confusion on the floor. A bowl of milk on the floor was found unspilled. The deceased's hair combs and false teeth were found on the bed with the body. The scalp wound on the accused's head, as testified by the doctor, was a mere scratch, an abrasion so light as not to penetrate the cuticle. It was not conceded by the state that the wound on the top of the head of accused was a gunshot wound; but, on the contrary, the state claimed that it was inflicted by the accused in furtherance of his defense of justifiable homicide. The physician who dressed the wound said it was free from powder burns. There was no evidence whatever to show that the wound on the scalp of the accused and the hole in his hat had any relation to each other. It seems that the hat said to have been worn by the accused at the time he was shot was stolen from the possession of the attorney for the accused.

The accused at the time of the tragedy was about 62 years old, and the deceased about 41 years old. His weight was about 220 pounds, and hers about 202 pounds. The accused in his own behalf testified to many quarrels occuring between himself and deceased at intervals during all their married life. He testified that she had driven him from his home; had often threatened to kill him; had sued him for a divorce; caused his arrest, and placed him under a peace bond; and that she was persistently demanding that he make over to her title to certain lots and lands he owned in Gotebo. He also testified that she did everything to defeat him in a certain contest involving the town site of Gotebo, and also to having a personal difficulty in her presence with her former husband; of her villification of him and his mar-

ried son, who had married a daughter of the deceased; that a young son of the deceased by a former marriage had treated him insolently; of his doting love for her, and cowardly fears of her. We have carefully considered instruction No. 22, complained of by the accused, and we think the court below committed no error in giving said instruction, in the light of all the evidence. The court gave the accused great latitude in detailing the many difficulties between himself and deceased, and giving the many threats made by her; and we think the accused was fairly dealt with in this connection.

The jury in this case, so far as the record shows was fair and unbiased. They heard the evidence as it fell from the lips of the witnesses; they had the opportunity of facing the witnesses on both sides; they had the means of judging of their intelligence, their candor, or want of candor, their interest, if any, in the event of the case. The jury may have concluded from the testimony that certain deductions therefrom would irresistibly follow, and that these deductions were inconsistent with the accused's innocence. We think the jury was justified in believing that the evidence offered by the defense in justification of the homicide was invented by the accused to conceal the actual truth of his conduct, and thereby to put the acts of the deceased in a false and unfavorable light before those who should have to pass upon the question of his guilt or innocence. The jury probably concluded that the wounds of the deceased were "dumb mouths" "silently proclaiming" the physical impossibility clearly apparent from such wounds, and that said wounds could not have been inflicted, or resulted from shots fired from a pistol then held in the hand of the deceased, and that, the defense of justifiable homicide set up by the accused was thereby overcome and disproven, and the jury, as a matter of law, had a right to disregard it.

The jury may also have believed from the evidence of the peculiar position in which the pistol was found in the unclinched hand of the deceased that the pistol was placed there after death,.

and after the muscular convulsions of her body had ceased; they may have concluded from the evidence that the reasonable hypothesis consistent with the facts proven was that the deceased had taken asleep across the foot of the bed, while lying on her right side, with her head near the wall; that the accused standing at the foot of the bed, in a position near and partially over her, fired the shot which entered near the left ear; and that to complete the work of destruction the second shot, within a few seconds thereafter, was fired into her body, and caused death to be doubly sure. The jury may have justly concluded from the evidence that the accused had, before the killing, in his own mind outlined a plan of defense satisfactory to himself; but that in so doing he probably did not reckon rightly with the immutable and eternal laws of nature, nor could he prevent the inquisitive minds of men from investigating and pursuing to a logical conclusion the reasonable and natural deductions which follow from the well-known laws of cause and effect. The jury may also have concluded from the evidence that the 20 minutes immediately following the firing of the fatal shots were spent by the accused in putting the house in order for the ordeal near at hand, when every eye in the community would be turned in scrutiny upon it.

It is difficult to see how the jury in this case could have prevented being influenced to a considerable extent by proof showing that the bullet, which had passed through the neck and mouth of the deceased, was found concealed in a clot of blood in the bed clothing upon which the body of deceased was found. They undoubtedly were influenced by this evidence to believe, as they had a perfect right, that the shot that sent the bullet through the neck and mouth of the deceased was fired while the body was lying on the bed. . If not, the weight of the bullet itself would have caused it to fall downward onto the floor of the room, and if the force was sufficient, would have penetrated the wall of the room. The other bullet, found inside of the undervest of the deceased, shows conclusively that after the ball issued from the wound at the left nipple it declined by its own

weight until arrested by the garments of the deceased at the right nipple. It will be remembered that the body of the deceased when found was lying on its left side or stomach. Had the deceased been on her feet at the time this bullet was fired, it would have naturally gravitated downward.

The jury were undoubtedly also influenced against the innocence of the accused by the undisputed proof of the apparent disorder of the room in which the body was found. The dining table was upset, and a dozen or more dishes were on the same, the dishes were thrown to the floor, but none were broken. The typewriter was also thrown from the table onto the floor, and was found upside down, but no proof that it was in any way broken or injured. The bowl of milk which the accused says he sat on the floor nearby the bed, and close to the scene of the death struggle, also was undisturbed and the contents intact.

The jury may also have reasonably concluded from the evidence that the three empty chambers in the revolver found by the deceased were accounted for by the two shots which pierced the body of the deceased, and that the other shot was used on the hat of the accused. It is true there is some discrepancy in the evidence as to whether the hat of the accused had two holes in it or but one. The defense offered no evidence to help clear this discrepancy, although it is proved and undisputed that the hat of the accused was taken possession of by one of his able attorneys, Mr. Morris. It seems to us, and it undoubtedly so appeared to the jury, that proof as to the number of holes in the hat of the accused could have easily been supplied, if in fact more than one hole was in the hat, shortly after the homicide. The record being practically silent on this point, the jury were free to believe from the absence of such proof that the hat either had but one hole immediately after the homicide, or if it had two holes, such holes could have no relation to the shot which the accused claims was fired by the deceased and took effect on his head. It will be conceded that the second hole in said hat, properly located, would have been a strong circumstance favoring the contention of the accused that he was in fact

shot by the deceased, as by him claimed; and, by like process of reasoning, the absence of such fact would naturally weigh against the best interests of the accused. Under the circumstances, therefore, the jury in all probability concluded that the wound upon the head of the accused was not made by a bullet, but was self-inflicted, or was caused by some other means. Especially is this true when the testimony of the doctor who dressed it, in describing the wound on the head, does not necessarily describe it as a gunshot wound.

The jury probably also took into consideration in this connection the evidence of the accused that the deceased was experienced and handy in the use of firearms, he having testified to the fact that he and deceased frequently went hunting together, and that she was a good shot, and the further fact that the evidence shows that the pistol which caused the death of deceased was a self-acting (double action) one; that if the pistol had been, in fact, in the hand of the deceased, and by her discharged at the head of the accused, and the accused in the act of sitting down to a table to use the typewriter, as testified to by him, before the accused could have gotten hold of the wrist of the deceased, who was admitted to have been a powerful woman, said pistol would have again been discharged, and especially is this true if the deceased had deliberately planned to kill the accused.

The jury being reasonable men, were bound to take into consideration the disorderly condition of the clothing of the deceased as described by the witnesses who found her dead, and about which there is no dispute. They may have wisely, and correctly, concluded from the proof that the accused thought it necessary or expedient, when the time arrived for placing in her hand the deadly weapon which was found, to roll the deceased onto her left side or stomach; because if the theory of the state is true, the deceased was lying on her right side on the bed when the shots were fired which killed her. The importance of placing her on her left side or stomach, therefore, becomes very apparent. This would be a necessary position if it was desired

that the right arm might be extricated or extended. The jury may also have justly concluded, that in the efforts of the accused to place the body in the position in which it was found, he besmeared his hands with the blood of his victim, a part of which was found on her leggings in the form of bloody finger marks. It may have been a hard thing for the jury to believe in this case (if the theory and evidence of the accused is true) that, after the deceased received the fatal wounds, in her death plunge, and after making the struggle testified to by the accused in her efforts to kill him, she should be able to deposit her body full length on the bed, and on the exact spot where she would naturally lie down for a rest or a nap, and that in so doing she had taken two combs out of her hair, her false teeth out of her mouth, and carefully laid them on the bed.

This court believes that trial by jury is the most satisfactory method for determining disputed questions of fact in a criminal case. Time has taught the world, and especially the English-speaking portion thereof, that the jury system is one of the institutions which is deeply rooted into the hearts of all fair-minded people. The wisest jurists and ablest statesmen have bestowed unstinted encomiums upon it. It stands as a great bulwark against oppression and imposition; and, in the opinion of this court, is the highest form of human justice. Believing as we do, we can conceive of no higher conception of the proper discharge of official duty than the giving to a verdict, rendered by a fair and impartial jury, in a fairly tried case, full credence and respect, and conclude that the facts have been properly determined. The facts having been so determined, there is but one true guide for this court, and that is to apply the law as it is written and make the enforcement thereof an imperative duty. This court accepts the verdict in the case at bar as a fair, honest, impartial, and humane finding upon the facts in the case. And again announces that this court will not reverse a case when the record before it shows that the accused had a fair trial, by a fair and impartial jury and trial judge, simply because some harmless technical error may have occurred at the trial.

We come now to deal with the instructions given the jury, and which are assigned as reversible error. The record discloses that at the conclusion of the court's instructions the accused excepted to each and all of the instructions separately. It is not contended by the briefs of the accused that all of the instructions were erroneous. Instruction No. 12, found at page 526 of the record, reads as follows:

"You are further instructed that under the laws of the territory of Oklahoma homicide is justifiable when committed in the lawful defense of a person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there is imminent danger of such design being accomplished."

The accused urges that the jury was, in effect, told that, in order that the homicide be justifiable, there must not only be reasonable grounds to apprehend a design to commit a felony, or to do some personal injury, but there must be actual and imminent danger of such design being accomplished. Again we are forced to an examination of the evidence to determine the correctness, or otherwise, of the charge No. 12 complained of. We find from the record that the testimony shows that the danger, if in fact danger there was to the accused, was actual danger, and was apparent to him; and, if this testimony is true on this subject, he could have taken but one view of the situation, and that was that he was in actual and imminent danger of great bodily harm or death, and therefore we think charge No. 12, though not a model of perfection, is not against the accused.

Charge No. 13, complained of, as shown by the record, is as follows:

"If you find from the evidence, beyond a reasonable doubt, that the defendant, A. N. Byers, at the time and place charged in the indictment, shot and killed the deceased in the manner charged in the indictment, you should then determine the question as to whether or not such act was without authority of law, and you are instructed that such act was not without authority of law if you find the same to have been justifiable, according to

the definition of justifiable homicide herein given, and you are further instructed that if the act charged against the defendant is shown to have been by him committed under such circumstances as that the act is excusable under the definition of excusable homicide as given in these instructions, he is not guilty as charged in the indictment herein, and you should so find."

Only a portion of the above charge is set up in the brief of the accused. This court believes in, and approves, the wisdom and binding force of section 5618, Wilson's Rev. & Ann. St. 1903, which reads as follows:

"On an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial right of the parties."

This court has a number of times, in other decisions, recognized the force of the above rule. Section 5144 of our statutes reverses the common law, which provides that the penal statutes are to be strictly construed, and expressly provides that all proceedings are to be liberally construed in the furtherance of justice, and therefore the common-law rule as to strict construction of penal laws has been repealed by the Legislature, and is not in force in this state; but, on the contrary, it is made the duty, by the statute, for this court to construe all laws liberally and in the furtherance of justice, and this court is thereby forbidden to reverse a conviction upon technical errors, or exceptions which do not affect the substantial rights of the accused. We, therefore, feel it our duty to examine the entire record before passing upon technical defects or exceptions in the charge of the court which do not go to the extent of affecting the substantial rights of the accused. We have carefully read every word of the record, and given every proposition therein contained careful attention and close scrutiny. It is further urged by the distinguished counsel for the accused that the court in said charge No. 13, in substance, told the jury that if they should find the acts of the accused to be justifiable under the definition given in the instructions in this case, he would not be guilty as charged in the indictment, and that by instruction No. 12 the jury was told, in effect, that in order that the homicide be justifiable, there

must not only be reasonable grounds to apprehend the design to commit a felony, or to do some great personal injury, but there must be actual and imminent danger of such design being accomplished, contending that these instructions eliminate from the jury the thought that the accused had a right to view the situation as an ordinarily prudent man, and act upon apparent, rather than real, danger to which he was subjected. From an examination of the entire record, and the authorities applicable thereto, we find instruction No. 12 is a fair definition of justifiable homicide under the laws of the territory of. Oklahoma, and seems to be in the language of a second subdivision of section 2189. Wilson's Rev. & Ann. St. 1903, which statute was in force at the time the offense charged was committed.

We find further on this subject that the justly popular and highly respected Court of Criminal Appeals of the state of Texas has passed directly upon this proposition in a well-considered and ably rendered opinion written by that great jurist, Judge Hurt, in the case of *Allen v. State,* found in 24 Tex. App., commencing at page 216, 6 S. W. 187. In this case Allen was charged with the killing of Tom Gill with a pistol. The testimony established the fact that there had been a passage of words between Allen and Gill, with a show of violence on the part of Gill just before the shooting occurred, and that Gill had a pistol in his hand. The real danger in the *Texas case* was the pistol in the possession of Gill. There was some discrepancy in the testimony as to who fired the first shot, as the shots were so close together. It is contended that the court erred in instructing the jury that it would be immaterial whether the danger was real, provided the defendant acted on the real appearance of danger. The specific objection raised to the charge of the court in this case is practically the same as that urged by the accused in the case at bar, and is this: "That it limits and abridges the right of the accused to act upon the real appearance of danger, and omits reasonable appearance of danger." The court in said case, speaking of danger with reference to whether the appearance of it is

"real" or "reasonable," takes its classification under one or the other, according as to whether the manifestations are positive or threatening and imminent, or are merely such as reasonably create alarm and apprehension for one's safety.

The danger in the case at bar was real, and consisted of the pistol in the hand of the deceased, as shown by the testimony of accused. "Real danger is danger such as is manifest to the physical senses. "Reasonable" danger, as the very force of the term imports, is something to be judged of by an exercise of reason and judgment, an exercise upon facts which require a construction to render their meaning apparent. It is manifestly true from the facts in the case at bar that whatever danger there was to accused, if any at all, was real. Hence the court discharged its whole duty when it instructed the jury as it did in instructions numbered 12 and 13. The court was not bound to instruct upon any other form of danger, because the facts did not present any other cause of danger. Every instruction given by the court to the jury in the trial of a cause should be confined to the issues made by the facts.

We have carefully read all the cases cited by counsel for the accused, filed in their separate and exhaustive briefs, and we cannot agree with the distinguished counsel that the facts in this case are indentical, or even similar, to the facts in the cases by them cited. The cases cited by counsel for the accused in this connection are cases that deal principally upon the shifting of the burden of proof, and they hold correctly that the burden of proof in a criminal case is never shifted to the accused, whether the defense is that of an alibi, or any other legitimate defense, holding that a defendant in a criminal action is presumed to be innocent until the contrary is proven. In case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to be acquitted. There is no such question in the record in the case at bar. The opinion of this court in this case would undoubtedly be in accordance with the many well-decided cases cited by the accused were the facts in harmony with said cases.

Coming now to instruction No. 18, complained of by the accused, which reads:

"If you find from the evidence that the deceased was the aggressor in the difficulty which resulted in her death, and made such assault with a revolver as aforesaid, the defendant in such case would have the right to use all necessary force to prevent the accomplishment of the apparent, threatened design; and if in so doing the revolver was discharged because of the act of the defendant, resulting in the death of the deceased, when in fact there was no intent on the defendant's part to cause such revolver to be discharged, and no intent to cause the death of the deceased by the act then performed, then and under such circumstances he would not be guilty of the crime charged against him, and you should so find in your verdict."

Counsel claims that the court erred, in the first part of this instruction, in assuming that the evidence on behalf of the accused showed that the gun was in the hand of the deceased when the fatal shot was fired, and that the shots were accidental, and that by so charging the trial court invaded the province of the jury in passing on a question of fact. We cannot take this view of this charge. One of two things are true: (1) The shots were either fired while the pistol was in the hand of the deceased, and the pistol was discharged during the scuffle which ensued between them by the accused in seeking to prevent the deceased from injuring or killing him; (2) or the shots were fired by the hand of the accused. The charge complained of, taken in connection with the whole charge, does not authorize the jury to draw the conclusion therefrom contended for by the accused. It is true that the accused has testified that he is unable to give a clear account of the things that happened immediately preceding and during the time the shots were fired which caused the death of the deceased, but the jury had a right to take into consideration, and doubtless did, all the facts and circumstances as they were developed and established by all the testimony, taking into consideration the location of the wounds, the point of entrance, range, and exit thereof, the size and relative strength of both the accused and deceased; and the jury may have justly

come to the conclusion that it was absolutely. physically impossibile for the wounds to have been inflicted while the pistol was in the hand of the deceased, and that they refused to believe the evidence and theory of the accused in the light of all the facts and circumstances. The charge, taken as a whole, fully and properly protected the rights of the accused in the light of the evidence . The accused urges with much force that the testimony shows the accused was shot in the 'back of the head with a revolver by the deceased. This fact, as well as all other facts in the case, being purely within the province of the jury to determine, and there being considerable conflict of testimony on this point, the jury, as reflected from their verdict, simply disbelieved (as they had a right to) the testimony of the accused; several witnesses having testified immediately after the shooting that they made search for, but were unable to find, a bullet hole, or holes in the wall of the house at a point near where the typewriter table, and to which the accused was about to sit at the time he claims the shot was fired by the deceased, and which inflicted the scalp woun'd on his head. It is true that some weeks after, as shown by the witnesses for the accused, a bullet hole, or what looked like a bullet hole, was found. The jury had a right to believe or disbelieve either or all of the witnesses who testified regarding the bullet hole being there or not, and we do not say the jury was not right in its conclusion upon the facts in this connection. We do not believe, in the light of the testimony, the charge was prejudicial to the rights of the accused.

The remaining question made by the record, and presented to this court for consideration, relates to the amended or supplemental motion for a new trial, predicated upon newly discovered evidence. We have carefully read the affidavits in support of said motion, and the affidavit of the county attorney in opposition thereto. From these affidavits it appears that most of the alleged newly discovered evidence was on hand and obtainable at the beginning of the trial. in the court below if reasonable diligence had been employed. Much of the evidence in

the supporting affidavits would be unimportant, immaterial, and cumulative. We cannot see how the alleged newly discovered facts set forth in the affidavits in support of the amended or supplemental motion for a new trial could change the verdict. There is not a word in said affidavits which throws any light upon the acts of either the deceased or the accused at the time or just before or after the homicide. See *Flohr v. Territory,* 19 Okla. 414, 91 Pac. 712. There was therefore no abuse of discretion by the trial judge in overruling said motion. The record amply and fully supports the verdict and judgment thereon. The rulings and charges of the court are free from reversible error. The judgment of the lower court must therefore be affirmed.

It is therefore ordered by this court that the sheriff of Comanche county, without delay, carry into execution the judgment and sentence of the court below.

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.

---

## ON PETITION FOR REHEARING.

### Denied July 29, 1909.

1. **APPEAL AND ERROR—Harmless Error—Admission of Evidence.** The admission of incompetent evidence before a jury is not ground for reversal unless it affirmatively appears from the entire testimony in the case that such improper evidence was calculated to influence the jury against the defendant in arriving at a verdict.

2. **SAME.** This court will not reverse a conviction on account of the admission or rejection of evidence unless both error and injury therefrom appears in the record.

(Syllabus by the Court.)

*A. J. Morris, Stillwell H. Russell* and *A. C. Cruce,* for plaintiff in error.

*Charles West,* Atty. Gen., and *Charles L. Moore,* Asst. Atty. Gen., for the State.

PER CURIAM: It is contended that there is an irreconcilable conflict between the original opinion in this case and the

principles announced by this court in the later case of *Price v. United States,* 101 Pac. 1036. If this contention is correct, then this court should recede from its position in the one case or the other.

The gravity of the case and the importance of the question raised has caused the members of this court to re-examine thoroughly the grounds upon which these two cases rest to discover if there is any conflict between them, and, if so, which decision is best supported by reason and authority. Upon this examination we have failed to find any conflict in the principles upon which both cases rest. In both cases it is held that expert evidence should not be received as to matters coming within the common experience of mankind, with reference to which one man is as competent to speak and his opinion is as good as that of another. As to this principle the two cases are agreed. The seeming conflict grows out of the fact that in the *Price Case* the admission of the opinions of the doctors that the arm of the deceased was hanging down by his side at the time that he received the fatal wound, which opinion was based upon the range of the ball through the body of the deceased, was held to be reversible error, because the evidence was not only incompetent, but was upon a pivotal point in the case which might have been decided by the jury in favor of or against the defendant. This point also directly involved the guilt or innocence of the defendant. The incompetent evidence objected to contradicted the evidence for the defense. The evidence of the defendant's guilt was by no means clear, satisfactory and free from doubt. An examination of the *Price Case* will show that without the testimony of the doctors, complained of, there was very little evidence of the guilt of the defendant. It was therefore clear to this court that the jury was influenced by this improper testimony, and, as both error and injury therefrom appeared upon the face of the record, we were compelled to reverse the conviction and grant a new trial.

In this case an entirely different condition of affairs is

presented in the record. It is sought to reverse the conviction because two physicians testified that in their opinions the wounds which caused the death of the deceased were not self-inflicted. There is not a single fact in this record, testified to by any one from which a sane jury coud draw the conclusion that these wounds were self-inflicted. If it had been possible for the deceased to have inflicted these wounds upon herself, it was clearly the duty of the eminent counsel for the defendant to have made that possibility appear. Their names are an absolute guarantee that nothing was overlooked or forgotten which would even remotely assist in the defense of their client. This court can safely rest upon the ground that no mistakes were made by counsel for the defense in this case, and that the reason why they did not attempt to show how the wounds upon deceased could have been self-inflicted was because they had found from actual experiments that the thing was a physical impossibility. The admitted facts are that the deceased was a stout, robust woman and weighed over 200 pounds. One shot entered under and behind the left arm and came out near the left nipple. The other ball entered about one inch below the left ear, ranged over the tongue and came out of the right cheek. That when a pistol is discharged with the muzzle against or near to the flesh of a human being, the skin will be black and badly discolored and there will be an orifice there much larger than the bullet or end of the pistol. These conditions did not exist as to the wounds on the neck of the deceased.

These are a few of the undisputed facts that appear in this record. How could these things be true and it be possible for the deceased to have inflicted these wounds upon herself? The undisputed facts of the case proved conclusively that it was impossible. If it had been possible for the deceased, being a stout woman, to reach around and shoot herself under the left ear, holding the pistol so far away from her neck as not to produce the condition described by the undisputed evidence in the record, then how could it be possible, while suffering from

the shock of the first wound, for the deceased to reach around her stout body and fire the shot that went under and behind her left arm and came out about the left nipple, and hold the pistol so far away from her body as not to burn her clothing : The same would be true if the wound under the left arm was made by the first shot. As there was no evidence which might have reasonably caused the jury to believe that the wounds upon deceased were self-inflicted, or might have raised a reasonable doubt upon this subject, then the statement of the doctors that in their judgment the wounds were not self-inflicted, while improperly admitted as evidence, was clearly harmless, because they did not contradict any possible conclusion that might have been rationally arrived at by the jury in favor of the defendant.

This brings us to consider the question as to whether the doctrine of harmless error is founded in justice and supported by reason, and as to whether it should be enforced by the courts. All lawyers will agree that there is such a thing as error without injury. But few, if any, of them will admit that the doctrine of harmless error should be applied to any of their cases. It required the passage of over six years before a member of this court could realize that this doctrine had been properly applied to one of his cases. The more we reflect upon the doctrine of harmless error the more clearly we will see that it is in strict harmony with the philosophy of the law, and that its recognition and enforcement by the appellate court is absolutely necessary for the administration of justice. The admission of the class of expert evidence condemned in both cases was held in this case to be harmless error and in the *Price Case* to be reversible error. Both cases held that the class of alleged expert evidence complained of is improper, and they also both recognize the doctrine of harmless error. Wherein, then, is the conflict in principles between them? If one is right, then the other is right also. If one is wrong, the other is wrong also, unless there is error in the one case or the other in the application of the principles which both announce.

Even under the most strict interpretation of the common law, mathematical certainty of guilt is never required before legal punishment is inflicted. Moral certainty is all that is required. Any other rule would defeat the enforcement of the law. The wisest and best men are painfully conscious of the fact that it is always possible that they may be mistaken as to their most cherished opinions. Owing to the imperfections of sight, and of memory and the inherent defects of the human mind, the most careful and truthful men are often mistaken in their statements of transactions occurring in their presence. Perfection is not an attribute of human nature. Hence it is always possible that mistakes may be made in the trial of any given cause. In fact it may well be doubted if a closely contested case was ever tried without the commission of some error of minor or greater importance. Therefore, if every case in which any error is committed must be reversed, but few, if any, convictions could stand, and law would become a farce and we would be involved in anarchy.

If, upon appeal, the only question to be decided was as to whether or not any error had been committed upon the trial of the case in the court below, without reference to the question of the guilt of the defendant, then the trial judge would be the real defendant and would be upon trial on the appeal, and the guilt of the defendant would become immaterial. Certainly no sane and impartial man should contend for a doctrine which would be so subversive of justice and which would result in such ruinous consequences to the enforcement of criminal law. It would make our courts a mockery, a snare and a delusion. Justice demands that in the administration of law its processes should never be allowed to become a game of skill between contending counsel. There has been entirely too much of this in the past. It has resulted in the miscarriage of justice in many cases and has bred a spirit of disgust for law and contempt for courts in the public mind.

Reduced to its last analysis the doctrine contended for by

counsel, if recognized, would require this court to hold that where evidence is admitted during a trial, and upon appeal it is held that such evidence was improperly admitted, a reversal of the conviction must follow, regardless of the character of the evidence in the record, upon the ground that the prosecution, having offered this evidence as a part of its case, it is stopped from denying its injurious effect. It appears to us that this application of the doctrine of estoppel, to the state, in the enforcement of its criminal law, on account of the ignorance or mistaken judgment of one of its servants, is technically run mad and gone to seed. We decline to be bound by or to follow a line of authorities so repugnant to reason, so demoralizing to respect for law and so destructive to justice. The habit or reversing cases upon technicalities is a very convenient one for appellate courts, for by so doing they can escape much hard labor and all responsibility for their decisions, for a violation of some technical rule can be found in almost every closely contested case. We believe that appellate courts should faithfully and fearlessly do their duty and decide every question presented, with reference to the substantial merits of the case in which it arises. In this way only can justice be administered.

Ignoring justice and deciding cause upon technicalities has not only largely lost to the courts the confidence and respect of the people, but it has also greatly alarmed the profession of law itself. No one can say that the members of the American Bar Association are sensationalists or are wanting in learning or ability. It is eminently a conservative body. Yet we find them crying out against and proposing a remedy for this evil. At its last meeting at Seattle, Washington, it recommended to Congress the following amendment to the Revised Statutes of the United States:

"No judgment shall be set aside, or new trial granted, by any court of the United States, in any case civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter of pleading

or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.—U. S. Comp. Stat. 715.

"No writ of error shall be issued in any criminal sase unless a justice of the Supreme Court shall certify that there is probable cause to believe that the defendant was unjustly convicted." —U. S. Comp. Stat. 575. (See Green Bag, October, 1908, page 525.)

The same recommendation was adopted by the New York State Bar Association at Buffalo, on January 28th, and 29th, 1909. (See Green Bag for February, 1909.)

While the above resolutions are in stronger language than our statutes upon the same subject, yet they are protests against the same evil, breathe the same spirit and tend in the same direction. While we do not recognize the action of the American Bar Association and of the New York Bar Association as authority, yet we are pleased to know that views which this court has repeatedly expressed in written opinions have found such impartial, able, and conservative indorsements.

Section 5618, Wilson's Rev. & Ann. Stat. 1903, is as follows:

"Sec. 5618 (482). On an appeal the court must give judgment without regard to technical errors or defects, or the exceptions which do not affect the substantial rights of the parties."

It is the fixed purpose of this court to carry out the spirit of this statute, and when a defendant has been properly charged with an offense and fairly tried and the evidence clearly establishes his guilt, this court will not reverse the conviction upon any technicality or exception which did not deprive the defendant of a substantial right. We cannot perform this duty without examining the entire record and going over the entire case. It is true that in the first instance the jury constitutes the triers of the case, but when a defendant by appeal brings a case to this court and thereby invokes our judgment, we cannot act intelligently upon his appeal and determine the application of the legal

principle involved to the facts in the case unless we carefully consider the evidence and weigh it just as an intelligent jury should do upon the trial. If we cannot do this, then this court is a miserable and contemptible farce.

There is no more technical court on earth than the Court of Criminal Appeals of Texas. During the earlier days of its existence it did sustain the doctrine for which counsel for defendant contend. Upon reason alone that court now substantially sustains our position in *Jinks v. State,* 33 S. W. 868. Jinks was convicted of murder in the first degree. Certain evidence was admitted which the court held was incompetent. Judge Davidson, in rendering the opinion of the court, said:

"But concede its inadmissibility; should the judgment be reversed? The answer to this question depends upon the nature of the case; that is, the probable effect that it could have had upon the jury, viewed in the light of all the testimony in the case. 'Where evidence of an important fact, material and pertinent to the issue, though additional to other facts legally in evidence, is erroneously admitted, the conviction should be set aside.' But, while this is the rule, reason would suggest an exception thereto. If the incompetent evidence could not have affected the case, there would be no reason in reversing the judgment on account of its admission. . . . Applying this exception, the facts of this case leave not a shadow of a doubt regarding the guilt of the defendant of the offense for which he has been convicted, with the testimony of Miss Maggie May eliminated. That appellant shot and killed the deceased cannot be questioned; that he shot him under circumstances which establish a homicide upon express malice is also evident, if murder upon express malice can be established by the positive proof of a number of witnesses. There is not a break in the testimony that is worthy of consideration, it all tending in the same direction, with the absolute certainty that appellant, with express malice, killed the deceased. No juror, with the least regard to his oath and the testimony in the case, could possibly have any sort of doubt as to the guilt of the appellant of murder in the first degree. This inadmissible testimony could not have had a feather's weight in inducing the jury to believe any fact which was necessary to make a case of murder upon express

malice. Again, it could not have prejudiced the appellant, because the jury gave him the lighter punishment. Under such a state of facts, while the testimony of Miss Maggie May may not have been admissible, we do not believe that the judgment should be reversed because of its admission by the court. We have given the record a careful examination, and find no reversible error."

It is worthy of remark that that illustrious jurist, Judge James M. Hurt, who has been most justly praised by counsel for defendant in their brief, participated in the consideration of this case and concurred in the conclusions reached.

John B. Shaw was found guilty of murder and sentenced to be hung. He appealed his case to the Court of Criminal Appeals of Texas. Upon the hearing the court held that the trial court had erred in permitting incompetent evidence to be admitted against the defendant, but, notwithstanding this fact, the conviction was affirmed and Shaw was executed. The case will be found in the 39 Texas Criminal Reports, 161. Judge Hurt rendered the opinion of the court. In giving the reasons why the conviction should be affirmed, he said:

"We have carefully examined the record, and it establishes the guilt of the defendant beyond any question. Lee Wilson, the accomplice, testified positively and directly to the facts attending the killing, and even if we eliminate his testimony, and consider the case solely upon the circumstantial evidence, the guilt of the defendant is established with that degree of certainty required by the rules regulating that character of testimony. The circumstances inherently leave no hypothesis consistent with appellant's innocence, but show conclusively and to a moral certainty that appellant, with his companion Lee Wilson, and no other persons, committed the murder. The record before us shows most astrocious murder, rarely equaled in the annals of any country. The only motive assigned is that appellant coveted the wife of Crane, the deceased. He was the manager of Pierce's ranch; and the deceased, his wife, and three small children were living on the premises, the appellant boarding with them. According to his own account, he was having a liaison with Mrs. Crane, but, not content with this, sought to have her entirely to himself by putting her husband out of the way.

We gather from the testimony that he had been brooding over the matter for some time, for evidently Lee Wilson came to the ranch, stayed all night on the 1st of November, to be in readiness on the morning of the 2d, in pursuance of a conspiracy. Wilson went to the woods, and stationed himself, while appellant hied to the field, where the deceased was engaged in picking cotton, and there decoyed or forced him to mount his horse, and accompany him to the point where Wilson was waiting. There these parties, armed, forced the defendant to go into the thickly wooded pasture (as significant of its character, it is called 'Jungle Pasture'); and thence the testimony shows that they forced him along the canyon, and to a remote and thickened portion of the same. *En route,* appellant cursed and abused him, and told him that he intended to kill him. Twice the deceased attempted to escape, but they pursued and overtook him. Appellant shot him in the back. He fell from his horse. The parties got down and put him on his horse again and, when he had proceeded into a dense thicket, appellant again shot him twice with his winchester. Not content with this, after he had fallen upon the ground, he broke his skull in five or six places with his gun. The parties then separated, Wilson taking a circuitous route back to Cleburne, and appellant returning to the home of the deceased, and then cooly sitting down with the family, and eating dinner. As stated above, few cases equal this in horror, and none surpass it. King David, when he sacrificed Uriah, in order to possess himself a wife, placed him in front of the battle. He was armed, and had some chance for his life; and if he fell, he would at least perish honorably, in defense of his country. But here, instigated by the same character of motive, appellant gave his victim no opportunity whatever. He forced or decoyed him from his labor in the field into the jungle, there not to engage in equal combat, but re-enforced by another, with gun or pistol, set upon and shot him to death, unarmed and helpless, and while fleeing for his life. In our opinion no punishment can be too severe for one who, after having claimed to have debauched the wife, decoys her husband into a jungle, and murders him in the brutal and cowardly manner disclosed in this record. The jury simply did their duty in visiting upon him the highest penalty of the law. We find no error in the record requiring a reversal of the judgment, and it is accordingly affirmed."

Whatever Judge Hurt's views may have been in his younger

days, upon the question of harmless error, the cases of *Jinks v. The State,* 33 S. W. 868, and of *Shaw v. The State,* 39 Tex. Crim. Rep. 151, present his mature views, after having spent many years upon the bench and seeing how often justice had been defeated and the guilty had escaped punishment through the mysticism of technicalities.

The conclusions announced in the cases of Jinks and Shaw are not based upon any statute and no authorities are cited in support of them. They are founded alone upon the eternal principles of truth and justice, and as such we give them our hearty approval.

The enforcement of the doctrine of harmless error in Oklahoma will greatly improve the character of our criminal trials. Lawyers will be compelled to try their cases upon their actual merits, and will cease devoting so much time in attempting to force technical errors into the record. The needless waste of much valuable time and the expenditure of a great deal of money will be saved, and far better results will be reached in the administration of justice, and the courts will gain the confidence and respect of the people, and acts of mob violence will cease to disgrace our state.

The reversal of the just convictions of the guilty, upon purely technical questions, is the prime cause of want of confidence in the courts. This want of confidence often results in mob violence on the part of a long-suffering and outraged public. We have the highest possible authority for this statement, for we are told in the Bible that:

"Because sentence against an evil work is not executed speedily, therefore the heart of the sons of men is fully set in them to do evil." (Ecclesiastes, 8-11.)

In a public address delivered at Ithca, New York, Hon. Andrew D. White makes this startling but truthful statement:

"While the number of murders is rapidly increasing, the procedure against them is becoming more and more ineffective, and, in the light of recent cases in New York and elsewhere, is seen to be a farce.

"One of the worst results of these causes is the growing opinion among the people at large that men with money can so delay justice by every sort of chicanery that there is a virtual immunity from punishment for the highest crimes."

In a paper presented at the thirty-second annual meeting of the New York State Bar Association, held at Buffalo, January 28th and 29th, Hon. E. P. Wheeler truly says:

"It seems to have been forgotten that society has an interest in the punishment of criminals. All authorities on criminology agree that the certainty of punishment is far more important in the prevention of crime than its severity. The present system tends to make the punishment of crime as uncertain as human laws can make it. The old maxim is forgotten: *Judex damatur cum nocens absolvitur.*

"A favorite devise of the gentlemen who achieve success in the manumission of murderers and the protection of the criminal classes is to apply to a federal judge for a writ of *habeas corpus.* He finds there is no cause for its issue and orders the prisoner remanded. Then an appeal is taken to the Supreme Court and the execution of a just sentence is stayed, while hysterical appeals are being made for pardon. On the other hand, we see the populace, enraged by the delays of justice, engaged in equally hysterical lynching. The innocent suffer. The guilty escape. And we call this civilization."

The original opinion in this case affirming the conviction of the defendant was not based upon the approval by this court of the rulings of the trial court with reference to the admission of the alleged expert testimony, but on the contrary the case was affirmed alone upon the ground that the evidence against the defendant was so overwhelming and conclusive that there could be no other rational deduction drawn therefrom except that the defendant was guilty, and that the evidence objected to was harmless error. An impartial and intelligent jury could not be found who, with a due regard for the unobjectionable testimony in this case and their oaths, could come to any other conclusion than that the defendant unlawfully took the life of the deceased. The evidence all tends in the same direction and, with as near approach to certainty as human testimony can attain, shows that the defend-

ant is guilty. The case could not be made stronger against the defendant than it is made by the testimony which is perfectly competent. Strike out the incompetent evidence and the state's case would not be in any manner weakened. The guilt of the defendant was the only rational conclusion at which the jury could arrive, with the evidence of Drs. Miller and Voyles stricken out. Therefore their evidence could not have affected the case and its admission was harmless error.

The idea that the deceased may have inflicted the wounds upon herself, which caused her death, in the light of the physical facts in this case, is just as unreasonable as the statement of the Roman soldiers that while they slept the disciples came and stole the body of Christ. How could they tell what happened while they slept? How could a 200 pound woman reach around her body and, with a pistol held so far from her that her clothes were not badly scorched, shoot herself under and behind her left arm, and the bullet come out at her left nipple? One statement is just as unbelievable as the other.

We realize that a great responsibility rests upon this court and that we have a sworn duty to perform, and we feel that it would be a crime against society to reverse this conviction, in the light of the entire record in this case. If we thought that the alleged expert evidence in this case could have had any influence upon the jury in convicting the defendant, we would seriously consider the question of granting a new trial. But we could not entertain such an opinion without reflecting upon the intelligence or integrity of the jury. There is nothing in this record which suggests a doubt upon this question. In the face of the entire record we have failed to find any error which would justify us in setting aside the verdict and the judgment of the court rendered thereon. Having arrived at this conclusion after a most painstaking re-investigation of the entire record, our duty is plain.

This court is largely responsible for the property, the liberty, and lives of the people of Oklahoma. Next to honor, human life

is the most sacred thing on earth. He who needlessly takes it must be held to a strict responsibility for such action. Laws are made to be enforced. Punishments are prescribed to be inflicted. If men do not respect the law they must at least be made to fear it, and to know that while justice may move with a leaden tread, it crushes with an iron heel.

It is true that the conduct of the deceased is not above criticism. That she conducted herself in a very unwifely manner is conclusively shown from the testimony in this case. But while she gave great offense to her husband, most grievously was she made to suffer for it. If he could not live with her in peace, why did he not separate from her? Her conduct gave him ample justification for so doing. But we are now dealing alone with the question of the guilt of the defendant. There is nothing in the record which justified him in constituting himself sheriff, judge and jury, and to arrest, try, condemn, and execute her without even giving her the opportunity to say, "God have mercy on my soul."

The defendant is the author of his own misfortune. Giving vent to his unlawful and wicked passions has brought him to the position which now confronts him. He has no one except himself to blame for the condition in which he finds himself. We have discussed this question at length, because our criminal jurisprudence is now in its formation period, and we desire the bench and bar to understand fully the reasons and the grounds upon which we base our determination. When a defendant has been properly charged with an offense and fairly tried and convicted, and the evidence sustains the conviction, we will not reverse the case upon any technicality or exception which did not work an injustice to the defendant.

Rehearing denied.